FILED

2005 May-23  PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE LOUQUE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-04-S-1188-NE |
| | ) | |
| CITY OF HUNTSVILLE, *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action is before the court on the motion of counsel for plaintiffs, J. Allen Brinkley ("Brinkley") and Teresa Ryder ("Ryder") (together, the "movants"), for permission to withdraw as counsel of record, and for sanctions against defendants, Chet Williams ("Williams") and the City of Huntsville, Alabama ("COH").[1] Movants' motion flows from events that occurred in connection with felony criminal charges pending against plaintiff, Catherine Louque, in the Circuit Court for Madison County, Alabama.[2]  Those criminal charges did not arise from the facts underlying

---

[1]Doc. no. 26.  The motion explicitly states that movants are seeking sanctions against *defendants,* not against defendants' counsel.  Further, it is clear that plaintiff's counsel are moving for sanctions in their own right, not on behalf of their client.

[2]*See* doc. no. 27 (Supplement to Motion to Withdraw and for Sanctions), Exhibit A (Affidavit of Catherine Louque), at 1; and, doc. no. 29 (Defendants' Response to Motion to Withdraw and for Sanctions), Exhibit A (Affidavit of Donald Rizzardi, Assistant District Attorney), at ¶ 3 ("On or about August 1, 2003, Ms. Louque [plaintiff herein] was indicted by a Madison County Grand Jury on two counts of possession of a controlled substance in violation of section 13A-12-212 of the <u>Alabama Code</u> and one count of attempted distribution of a controlled substance in violation of sections 13A-12-203 and 13A-12-211 of the <u>Alabama Code</u>.").

this action. Stated differently, there is not a common nucleus of operative facts that connects this civil action to the state criminal prosecution. Further, plaintiff is represented by separate counsel, David McDowell, in the state criminal proceedings.[3]

Movants state that defendants engaged in "improper conduct," including "extortion and an abuse of process," in connection with a plea bargain offered to plaintiff by Donald Rizzardi, the Madison County Assistant District Attorney to whom the state criminal case was assigned.[4] As plaintiff had no prior criminal record, she expressed an interest in being allowed to participate in a drug-rehabilitation, diversion program known as the "Madison County Adult Drug Court program" ("Drug Court"),[5] in lieu of prosecution.[6] As best this court understands that program from the various documents submitted by the parties, the state criminal charges against an adult defendant who has not previously been convicted of a felony drug offense are held in abeyance for the period of time that is sufficient for the defendant to enroll and participate in Drug Court; and, upon successful completion of all requirements of the rehabilitation program, the criminal charges are dismissed.

Rizzardi agreed to allow plaintiff to participate in Drug Court, *but only if* she

---

[3]*See* doc. no. 26, at 2.

[4]*Id.* at 2-3.

[5]Rizzardi Affidavit, at ¶ 4.

[6]*See* Louque Affidavit, at 1.

agreed to dismiss her claims in this unrelated federal action, with prejudice.[7]  Rizzardi

explained his reasons for conditioning the plea offer upon dismissal of the present

case as follows:

> A condition of [D]rug [C]ourt participation is the compliance with all
> program rules, including honesty with all staff members.   In my
> judgment, Ms. Louque was not an appropriate candidate for the [Drug
> Court] program if she continued to pursue the civil case because I had
> been made aware that some of her witnesses had been approached by her
> to lie at *the civil trial*, if it became necessary.[8]

Plaintiff initially rejected the prosecutor's demand,[9] but later discussed it with

Brinkley, who reacted as follows:

> I told her "I don't believe it, no one in their right mind would be that
> stupid as to connect the two cases" and that I was in other trials that
> week and I couldn't and wouldn't advise her.   *I told her David
> McDowell was a good lawyer and he would properly advise her.*  I then
> got a call from David McDowell and he informed me that he was
> representing her and that negotiations were to the effect that she would
> not get [D]rug [C]ourt unless she dropped the civil case.  I told him I
> thought that was illegal but I would never tell her she could not drop this
> civil case under the circumstances.  *It was her call.*[10]

Upon further reflection, and following consultation with the attorney

representing her in the state criminal case, plaintiff agreed to dismiss this action in

---

[7]*Id.* at 2.

[8]Doc. no. 29 (Defendants' response to Motion to Withdraw and for Sanctions), Exhibit A
(Affidavit of Donald Rizzardi), at ¶ 4 (emphasis supplied).

[9]Louque Affidavit, at 2.

[10]Doc. no. 26 (Motion to Withdraw and for Sanctions), Exhibit A (Affidavit of J. Allen
Brinkley), at 2 (emphasis supplied).

exchange for the opportunity to participate in the Drug Court diversion program.[11]

Plaintiff, McDowell, and Rizzardi executed a written document memorializing this agreement, the pertinent portions of which read as follows:

### AGREEMENT TO ENTER ADULT DRUG COURT

On the below noted date [April 7, 2005], the parties reach an agreement to enter the Madison County Drug Court as opposed to go into a jury trial.  The terms are as follows:

1.   Defendant will enter a plea [of guilty] as charged to Count III of the indictment. [sic] An Attempt to Obtain Drugs by Fraud.
2.   Defendant will comply with all rules of that program.
3.   Defendant will have her pending federal lawsuit, 05:04CV1188CLS, *dismissed with prejudice*, and denotes that with her signature attached to this agreement.
4.   The Defendant will have all felony drug charges against her dismissed in Madison County upon completion of all of the requirements of Adult Drug Court.[12]

Plaintiff discussed the agreement with McDowell prior to executing it, and McDowell states that plaintiff "clearly understood that dismissing the federal lawsuit was a condition to being allowed to participate in the drug court program."[13]  It is not clear from the current record, however, whether McDowell actually advised plaintiff to accept the offer.

---

[11]Louque Affidavit, at 2-3.

[12]Doc. no. 26 (Motion to Withdraw and for Sanctions), at Exhibit B (Agreement to Enter Adult Drug Court) (emphasis in original).

[13]Doc. no. 27 (Supplement to Motion to Withdraw and for Sanctions), Exhibit B (Affidavit of David McDowell), at 1.

The state prosecutor forwarded a copy of the agreement to Mike Fees ("Fees") and Greg Burgess ("Burgess"), attorneys for defendants herein, who subsequently prepared a Stipulation of Dismissal and forwarded it to movants for execution.[14] Movants refused to execute the stipulation, however, and, instead, filed the subject motion.[15]

Movants certify they served plaintiff with a copy of their motion to withdraw, and advised her that she could file an objection to the motion within ten days.[16] Further, it is clear that plaintiff is aware of her attorneys' motion, because she later executed an affidavit in support of it.[17]  Plaintiff did not object to the motion, and the court finds it well-taken.  Accordingly, the motion to withdraw from representation of plaintiff is due to be granted.

The question of whether this court should impose sanctions, however, is a more difficult one.  As an initial matter, the court notes that movants seek sanctions against *defendants*, not against defendants' counsel.  Further, it appears that movants are requesting the court to impose sanctions pursuant to its inherent supervisory

---

[14]Rizzardi Affidavit, at ¶ 6; Brinkley Affidavit, at 2.

[15]Doc. no. 26 (Motion to Withdraw and for Sanctions), at ¶ 2.

[16]*See id.* at 5 (Certificate of Service). *See also* doc. no. 4 (Initial Order Governing All Further Proceedings), at § VI (requiring attorneys whose motion to withdraw would leave their client unrepresented to serve the client with a copy of the motion and advise the client of her right to object within ten days).

[17]*See* Louque Affidavit.

authority.[18] *See, e.g., Byrne v. Nezhat,* 261 F.3d 1075, 1106 (11th Cir. 2001) ("One aspect of a court's inherent power is the ability to assess attorneys' fees and costs against the client or his attorney, or both, when either has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'") (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991)).  This power "is derived from the court's need 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Byrne,* 261 F.3d at 1106 (quoting *Chambers,* 501 U.S. at 43) (bracketed alterations in original).  The Eleventh Circuit has explained that "'[t]he key to unlocking a court's inherent power is a finding of bad faith.'" *Byrne,* 261 F.3d at 1106 (quoting *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir. 1998), and citing *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir. 1995)).  "'A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.  A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.'" *Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting *Barnes,* 158 F.3d at 1214).  The court's inherent

---

[18]In the Motion for Sanctions, movants did not identify the authority pursuant to which they seek sanctions.  In their response to the motion, defendants assert, and the court agrees, that sanctions would not be available under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, or Local Rule 83.1(b).  In their reply to defendants' response, movants' only argument in support of sanctions is pursuant to the court's inherent authority.

power is "potent," and therefore, "it should be exercised 'with restraint and discretion.'" *Byrne,* 261 F.3d at 1106 (quoting *Chambers,* 501 U.S. at 50).

As movants point out, the agreement plaintiff executed is akin to a so-called "release-dismissal agreement," in which a criminal defendant agrees to dismiss a civil case *that is related to the criminal charges against her* in exchange for having the criminal charges dropped.  Courts carefully scrutinize such agreements for potential violations of public policy, but they are not void *per se.*

Rather, as the Supreme Court held in *Town of Newton v. Rumery,* 480 U.S. 386 (1987), courts should evaluate the validity of such  agreements on a case-by-case basis.  *Id.* at 397.  A release-dismissal agreement may be upheld: when it is "the product of an informed and voluntary decision"; when there is no evidence of prosecutorial misconduct; and, when enforcement of the agreement would *not be* contrary to the public interest.  *Id.* at 393-97.  *See also Penn v. City of Montgomery,* 273 F. Supp. 2d 1229, 1236-38 (M.D. Ala. 2003) (upholding a release-dismissal agreement when evidence demonstrated the agreement was voluntary, there was no prosecutorial misconduct, and the public interest was served).  *Cf. Vallone v. Lee,* 7 F.3d 196, 199 (11th Cir. 1993) (refusing to uphold a release-dismissal agreement when evidence indicated its execution was not voluntary).[19]  The Supreme Court

---

[19]The *Rumery* Court acknowledged "that some release-dismissal agreements may not be the product of an informed and voluntary decision.  The risk, publicity, and expense of a criminal trial

upheld the release-dismissal at issue in *Rumery* because it satisfied all of the foregoing factors.  As the court stated,

> Rumery is a sophisticated businessman.  He was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement.  Rumery considered the agreement for three days before signing it.  The benefits of the agreement to Rumery are obvious: he gained immunity from criminal prosecution in consideration of abandoning a civil suit that he may well have lost.
>
> Because Rumery voluntarily waived his right to sue under § 1983, the public interest opposing involuntary waiver of constitutional rights is no reason to hold this agreement invalid.

*Id.* at 394.  The court also concluded there was no evidence of prosecutorial misconduct.  The prosecutor had "an independent, legitimate reason to make this agreement directly related to his prosecutorial responsibilities" — *i.e.,* he was concerned about sparing a key witness the "public scrutiny and embarrassment" she

---

may intimidate a defendant, even if he believes his defense is meritorious." *Id.* at 393.  Even so, the court stated that the risk of intimidation did not justify invalidating all such agreements, because the risk is no greater than with other varieties of plea bargaining, which are permissible despite the resulting waiver of constitutional rights.  *Id.*

Further, the court pointed out that upholding release-dismissal agreements may, in some cases, actually *protect* the public interest.

> [T]he burden of defending [Section 1983] lawsuits is substantial.  Counsel may be retained by the official as well as the governmental entity.  Preparation for trial, and the trial itself, will require the time and attention of the defendant officials, to the detriment of their public duties.  In some cases litigation will extend over a period of years.  This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest.  To the extent release-dismissal agreements protect public officials from the burdens of defending such unjust claims, they further this important public interest.

*Rumery,* 480 U.S. at 395-96.

would have endured if she had been required to testify in the case.  *Id.* at 398-99.

The court recognizes that the agreement plaintiff executed is distinguishable from the "release-dismissal" agreement discussed above, because it involves dismissal of a civil case *unrelated* to the state criminal charges.  The court further recognizes that the validity of the agreement plaintiff executed is not in issue. Nonetheless, the court concludes plaintiff's agreement — exchanging a release of civil claims for freedom from criminal prosecution — is sufficiently similar to a traditional release-dismissal agreement for the court to find guidance in the opinions discussing the validity of such agreements.

*Rumery* and its progeny instruct that courts should approach such agreements with caution, and even suspicion, wary of the potential for misconduct and abuse.  If voluntariness, public policy, and the conduct of attorneys must be considered in deciding whether to *uphold* an agreement exchanging dismissal of a civil lawsuit for freedom from criminal prosecution, those factors also should be important considerations in deciding whether to impose sanctions in connection with such an agreement.  Further, if such agreements can be considered enforceable, logic dictates that their negotiation and execution, standing alone, is insufficient to justify the imposition of sanctions.  The court must find *additional* evidence of bad faith on the part of the attorneys proposing and negotiating the agreement.

Despite the great potential for abuse in connection with the execution of so-called release-dismissal agreements, however, the courts have not often addressed whether the conduct of attorneys related to an agreement is sanctionable. Indeed, the court has found only one case discussing sanctions in connection with a similar agreement.

In *Hollands v. Attala County,* No. CIV.A.1:94CV206-D-D, 1996 WL 671406 (N.D. Miss. Oct. 31, 1996) — which is cited by movants — Frank Hollands sued the county and its sheriff for holding him in custody without legal authority. *Id.* at *1. When Hollands subsequently was arrested *for criminal conduct unrelated to his earlier confinement*, his attorney — a public defender employed by the county — proposed to the Assistant District Attorney ("ADA") assigned to Hollands' case that he drop the criminal charges against Hollands in exchange for Hollands' dismissal of his civil lawsuit against the county. *Id.* at *2. The ADA agreed to drop the criminal charges, and Holland dismissed his civil lawsuit. *Id.* Subsequently, Hollands' civil attorneys filed a motion to sanction the county and its attorneys. *Id.*[20]

---

[20]The *Hollands* court referred to the agreement in question as a "release-dismissal" agreement, and noted the following with regard to its choice of terminology:

These types of arrangements are commonly known as release-dismissal agreements, because the criminally charged party agrees to provide a civil release from liability and exchange potential causes of action for the dismissal of criminal charges arising out of the *same conduct* as the civil chose in action. *See, e.g., Livingstone v. North Belle Vernon Burough,* 12 F.3d 1205, 1207 (3rd Cir. 1993); *Vallone v. Lee,* 7 F.3d 196, 197-98 (11th Cir. 1993); *Woods v. Rhodes,* 994 F.2d 494,

The district court questioned the validity of the agreement, but since no party had raised that issue, the court analyzed only the propriety of the conduct of four attorneys involved in the matter: *i.e.,* the public defender; the Assistant District Attorney; the County Attorney, who also served as civil defense counsel; and, the county's private civil defense counsel. *Id.* at *3-4. The court opined that the public defender had committed a serious ethics violation:

> In proposing and negotiating a release of civil liability for Attala County from his client Mr. Hollands, [the public defender] also obtained a release from Mr. Hollands which relieved the county from any liability that might attach by virtue of the actions of county officials — including his own official actions as Public Defender of Attala County with regard to Mr. Hollands' claims of wrongful incarceration. Regardless of whether this was the intention of [the public defender], the situation smacks of impropriety.

*Id.* at *4. The court stated that the public defender should have withdrawn from representation of Mr. Hollands, and since he failed to withdraw, he committed an additional ethics violation by counseling Hollands on whether to drop his civil case,

---

496-97 (8th Cir. 1993). Fundamentally different in this case, however, is the fact that Mr. Hollands had *already filed* this civil action which was *wholly unrelated* to the criminal charges dismissed in this agreement. This factor would be highly relevant to the court in determining if this type of agreement were violative of the public interest. *See Rumery,* 480 U.S. at 401, 107 S. Ct. at 1196. The agreement reached in this case would more precisely be termed a "dismissal-dismissal" agreement and it is this distinct difference that appears to be one of the sources of problems surrounding this case. In order to prevent confusion, the court will refer to the agreement as one of "release-dismissal."

*Hollands,* 1996 WL 671406, at *2 n.1 (emphasis in original).

a matter on which Hollands was represented by separate counsel. *Id.* at *5. Regardless of these notable ethics violations, however, the court concluded it had no authority to sanction the public defender because he had never appeared before the court. *Id.* The court found the other attorneys' conduct less egregious. First, the ADA did not act improperly, because he did not instigate the release-dismissal agreement. *Id.* at *5-6. Instead, the prosecutor simply responded "to the inquiry and request of Mr. Hollands," and he emphasized that Hollands' counsel should ensure "that this is something that Mr. Hollands wanted to do and that he was under no compulsion to enter into any such agreement." *Id.* at *6.[21]

Second, the county attorney was not sanctioned because he, too, had limited involvement in negotiating the agreement. The public defender approached him about entering into the agreement, and he communicated the proposal to the Assistant District Attorney. *Id.* Then the county attorney left his office for a few days, and when he returned, Mr. Hollands had executed the agreement. *Id.* Based on those limited facts, the court found no evidence of bad faith conduct by the county attorney. *Id.*

Finally, the court also declined to impose sanctions on the private civil attorney

---

[21]The court noted that, even if the Assistant District Attorney's conduct had been sufficiently egregious to justify imposing sanctions, the court would not have possessed the authority to sanction him, because he had never made an appearance in the case. *Hollands,* 1996 WL 671406, at *5.

who was defending the county.  The defense attorney drafted the agreement for Mr. Hollands to sign, but he was not involved in negotiating the agreement.  Although the defense attorney engaged in some communications with both the public defender and Mr. Hollands' civil counsel that might have presented technical violations of ethics rules, there was no evidence of bad faith conduct.  *Id.* at *7.

In conclusion, although the *Hollands* court found no authority to impose sanctions, it expressed "serious concerns over the ethical quagmire created in the wake of [the] lawsuit," and it referred the matter to the state bar for an ethics investigation.  *Id.*

Similarly, the alleged conduct of defense counsel in this case and the prosecutor in the state case raise serious concerns.  Burgess and Rizzardi acknowledge engaging in conversations about plaintiff.[22]  Burgess states that, in each instance, he merely inquired about the status of plaintiff's criminal charges, "because the outcome of Ms. Louque's criminal case, in my judgment, had potential relevance in the civil case."[23]  As far as this court can see, the *only* "relevance" of the state criminal case to this one was as impeachment.

Moreover, both Burgess and Rizzardi acknowledge exchanging information

---

[22]Rizzardi Affidavit, at ¶ 6; *see also* doc. no. 29 (Defendants' response to Motion to Withdraw and for Sanctions), Exhibit A (Affidavit of C. Gregory Burgess), at ¶ 5.

[23]Burgess Affidavit, at ¶ 5.

each felt was relevant to the civil and criminal cases involving plaintiff.[24]  Even so,

Rizzardi insists that

> neither the City of Huntsville, nor Officer Williams, nor their lawyers in
> the civil case (including Mr. Burgess) ever insisted, requested, or even
> suggested that I plea bargain with Ms. Louque in any particular way, and
> more specifically, that I offer to allow Ms. Louque to enter [Drug Court]
> only on the condition that she dismiss the civil case.  Any contention to
> the contrary is absolutely false.[25]

Burgess confirms that assertion, saying:

> At no point in time during any of my conversations with Mr. Rizzardi
> did Mr. Rizzardi ever ask my opinion concerning how the prosecution
> of Louque's criminal case should be handled, or more specifically, how
> he should plea bargain with Louque.  Additionally, there was never an
> occasion when I ever expressed such an opinion to Mr. Rizzardi.[26]

Movants offer no evidence to contradict these sworn assertions, other than their

speculation that Burgess met with Rizzardi, and "apparently convinced him, by

sharing his litigation file in the present matter, that the Catherine Louque [sic] is a

'liar' in this civil proceeding, and therefore does not deserve the benefits of [D]rug

[C]ourt."[27]

The circumstances presented here are sufficiently suspicious to pique interest.

Why would a *state* prosecutor insist that plaintiff dismiss *with prejudice* all claims in

---

[24]Rizzardi Affidavit, at ¶ 6; Burgess Affidavit, at ¶ 5.

[25]Rizzardi Affidavit, at ¶ 5.

[26]Burgess Affidavit, at ¶ 5.

[27]Doc. no. 30 (Reply to Response to Motion to Withdraw and for Sanctions), at 2.

-14-

an *unrelated*, *federal* civil rights action pending against the *City of Huntsville* (a municipal corporation) and a city Police Officer as an express condition of the prosecutor's agreement to divert the plaintiff's pending felony charges from a jury trial docket to Adult Drug Court? Such conduct smacks of overreaching, and could serve as the basis for yet another lawsuit, pursuant to 42 U.S.C. § 1985, for conspiracy to violate civil rights, or an inquiry by the Alabama State Bar Center for Professional Responsibility.

Even so, movants' conclusory allegations are insufficient to carry the instant motion for sanctions. Although the circumstances presented here indeed are suspicious, movants have presented no actual evidence of bad faith conduct on the part of defendants' attorneys, much less on the part of defendants themselves. As in the *Hollands* case, the only attorney who unquestionably had a direct involvement in negotiating the release-dismissal agreement — Donald Rizzardi — cannot be sanctioned, because he is not before this court. Further, as in *Hollands*, the attorneys who *are* under this court's supervisory authority appear to have had more limited involvement in the negotiations. Neither Burgess nor either of the defendants was a party to the agreement, and Burgess's uncontroverted affidavit asserts that he did not attempt to influence Rizzardi's negotiations with plaintiff. Although the court suspects that Burgess had *some* influence, at least indirectly, on Rizzardi's decision,

it will not base its decision on that suspicion, given that Burgess's affidavit states to the contrary.  Absent more compelling proof of bad faith, the court is not willing to exercise its potent sanctioning powers.  *See Byrne,* 261 F.3d at 1106 (quoting *Chambers,* 501 U.S. at 50) (cautioning that the power to sanction "should be exercised 'with restraint and discretion.'").  Accordingly, the motion for sanctions will be denied.  Nonetheless, a copy of this memorandum of opinion shall be forwarded to the Alabama State Bar Association for a full and complete investigation into the ethical propriety of the conduct of Messers Burgess and Rizzardi.

Defendants' motions for summary judgment will be held in abeyance while plaintiff considers whether she will pursue her claims in this action and renounce the release-dismissal agreement she executed in the state criminal proceeding; and, if so, whether she will seek and retain new counsel to replace movants.

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 23rd day of May, 2005.

_____
United States District Judge